In the Matter of the Estate of
Alphonse Penne, Deceased.

BRISCOE et al,
*Appellants,*

*v.*

SCHNEIDER et al,
*Respondents.*

(P87-4-32; CA A48964)

775 P2d 925

Jarvis B. Black, Portland, argued the cause for appellants.

On the brief were Richard E. Paul and Black & Dupuy, Portland.

Robert L. Engle, Woodburn, argued the cause for respondents. With him on the brief was Eichsteadt, Bolland, Engle & Schmidtman, Woodburn.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Contestants Briscoe and Chapman appeal from a final order denying their petition to revoke the probate of an unsigned conformed carbon copy of a will executed in 1961 by their brother, who died on January 13, 1987. Administration of the estate had been started by proponent Alice Schneider (Alice) on April 15, 1987, alleging that decedent had died intestate; she was appointed personal representative. After administration had been under way for about seven months, she petitioned for appointment as personal representative under the 1961 will that was alleged to have been lost but not revoked prior to decedent's death, and the will was admitted to probate. This contest was then instituted to revoke the probate of that will, resulting in the order from which this appeal is taken. We review *de novo. Sanders v. U. S. National Bank,* 71 Or App 674, 694 P2d 548 (1985), *rev den* 299 Or 31 (1985).

Decedent Penne was survived by three sisters, proponent Alice, and the two contestants. Two brothers, John and Andrew Penne, and one sister, Madeline Cochran, died before his death. On the day of decedent's death, Alice's son, Steve, was at decedent's house and looked for any important papers, including a will. He located decedent's safe, which was eventually opened; in it he found an unsigned copy of the will in question in a sealed envelope. Alice and her son searched decedent's house thoroughly for the original of the will but did not find it.

Over a period of time, Alice, who had everything to gain by finding the original will, made every reasonable effort to find it. The will, prepared by decedent's attorney, Harold Uney, was dated June 2, 1961. After he executed the will, decedent took a copy and left the original with Uney. It is Uney's uncontradicted testimony that decedent came into his office in 1976 and asked for the original of the will and that Uney gave it to him. Alice put a notice in the *Oregon State Bar Bulletin* requesting that anyone having information concerning decedent's will notify her. There is no evidence that the original of the will ever left decedent's sole possession or that anyone other than decedent had access to or control over it at any time before his death.

The will provides for specific bequests of $1 to each of decedent's siblings, except Alice and Madeline, who share the

residue equally; if either or both Alice or Madeline were to die before decedent, leaving children, the children would inherit the parent's share. Evidence was adduced at trial showing that Alice and Madeline had each loaned decedent approximately $1,000 shortly before he executed the will so that he could build a home on farmland that he and his siblings had inherited from their father; he was purchasing the interests of his siblings. The others did not extend him a loan, although at least one of them was asked to do so. Although decedent lived across the road from contestant Mary Chapman, he had not spoken to her for 26 years, since they had had a disagreement concerning their brother Andrew. Decedent's relations with contestant Marguerite Briscoe appeared to have been normal and friendly. There is no evidence indicating any change in decedent's relationship with any of his siblings between 1961 and his death; however, Madeline died three months before decedent.

Alice testified that she had inquired of decedent on several occasions whether he had his affairs in order. Her earliest recollection related to an occasion in 1972, at which time decedent, although somewhat irritated by the inquiry, said that he had a will, that it was in his safe and that she should remove it from the safe after his death. He then gave her the combination to the safe. The only other evidence concerning the existence of a will is that, on October 19, 1985, when decedent was in the hospital, Alice and her son visited him. Alice again asked him if he had his affairs in order, and he stated that he had a will. That was 15 months before his death; during that period, Madeline, one of the two principal beneficiaries under the will, died.

**1, 2.** When a will is last known to be in the sole possession and control of the decedent, and the will cannot be found at the time of his death, the law presumes that the decedent destroyed the will with the intention of revoking it. *Van Vlack et al. v. Van Vlack,* 181 Or 646, 182 P2d 969, 185 P2d 575 (1947). The strength of the presumption depends on the extent of control that the decedent had over the repository of the will and the extent to which others had access to it. 181 Or at 658. When, as here, the decedent's control was absolute, and the only others having access to the will before or after his death were those who stand to benefit from it, the evidence required to overcome the presumption must be "clear and

satisfactory." *Price v. Wood*, 254 Or 259, 263, 456 P2d 500 (1969).

**3, 4.** Once the presumption is invoked, the burden is on the proponents to prove that the will has not been revoked. *Salter v. Salter, Adm.*, 209 Or 536, 307 P2d 515 (1957). Here, we have little to go on. The trial judge stated that decedent probably believed that the unsigned copy in his safe was the original of the will. That is a possibility, but it tends to conflict with Uney's testimony that decedent made a special effort to take possession of the original of the will, although he already had the conformed copy. The record shows that decedent's father had had a will, that he also had taken the original from his attorney and that it could not be found after his death. His estate was administered as an intestate estate. Therefore, presumably, decedent knew the consequences of intestacy. The only evidence supporting proponents is decedent's statement 15 months before his death that he had a will. The death of one of the two primary objects of his bounty during the period before his death could have triggered his desire to revoke the will, and he had ample time to do so. He may then have preferred to die intestate.

In short, we can only speculate. Proponents have not sustained their burden of proof by clear and satisfactory evidence that decedent's will was not revoked. Accordingly, they have not overcome the presumption of revocation.

Reversed and remanded.